UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ] | |
| ] | No.   17-CR-10048-LTS |
| v. ] | |
| ] | |
| CLEBER RENE RIZERIO ROCHA ] | |

### GOVERNMENT'S MEMORANDUM IN OPPOSITION
### TO DEFENDANT'S MOTION TO SUPPRESS

The government hereby responds to defendant Cleber Rene Rizerio Rocha's ("Rocha") motion to suppress statements, the search of an apartment, and the search of a cellular telephone (docket # 27).

### INTRODUCTION

Culminating a long-term money laundering investigation, on January 4, 2017, federal agents arrested Rocha a few hours after he handed a cooperating witness ("CW") a suitcase containing $2,200,000. The money was fraud proceeds from a massive pyramid scheme; co-conspirators in Brazil had dispatched Rocha to the United States in an effort to start laundering the money back to Brazil.

After Rocha was arrested the agents interviewed him, and that event is the basis for Rocha's current motion. As discussed below, while there is underlying substance to some of Rocha's claims, in service of his motion he mischaracterizes the agents' behavior. As is obvious from the video recordings of the event, the agents were always polite and not particularly aggressive with Rocha; they did not "threaten" him and although they surely tried to induce his cooperation, this did not amount to "intimidation." Rocha strains to paint the agents as improperly aggressive because he cannot otherwise contest his own waiver of rights and consent to search.

Rocha's interview that evening broke down into two sections: his first interview, which followed a Miranda waiver but ended with Rocha invoking his right to counsel, and a second interview about 30 minutes later, which happened after Rocha reinitiated conversation with the agents. As to the first interview, the government will not use it at trial – Rocha lied during nearly all of it and, though the agents acted in good faith, they arguably failed to stop questioning in response to a sufficiently clear invocation rights. The second interview, however, is not subject to suppression. The police cannot reinitiate interrogation after a defendant has invoked his Miranda rights – this is the prophylactic rule stated in *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). The *defendant* can, however, which is what Rocha did here: after being told he would be transported to jail, Rocha asked why he had to go to jail and began explaining that he was just doing someone a favor. The agent stopped him, asked if he wanted to talk to them, and Rocha confirmed that he did. This is enough. *See, e.g., United States v. Thongsophaporn*, 503 F.3d 51, 56 (1st Cir. 2007) (finding no violation where defendant reinitiated by asking what was going on).

Rocha knowingly and voluntarily consented to a search of his apartment as well. Moreover, it is settled law – from the Supreme Court on down – that a consent to search is valid even if given during a confession that is later suppressed. Fifth Amendment violations only prevent the use of defendants' statements *at trial*; they do not support suppressing physical evidence obtained via consent, so long as that consent was voluntary (in the literal sense). *See e.g., United States v. Patane*, 542 U.S. 630, 637-42 (2004) (holding that failure to provide Miranda warnings, even if deliberate, does not require suppression of evidence obtained through defendant's consent; declining to apply "fruit of the poisonous tree" doctrine to Fifth Amendment violations).

Moreover, the agents would have legally searched the apartment regardless of Rocha's consent. That is, there was an independent basis for the search: by the time of the interview, the agents had consensual recordings in which Rocha's co-conspirators talked about smuggling millions of dollars out of the United States, and Rocha had just given a CW $2,200,000 in cash, after which the agents had followed Rocha to an apartment complex in Westborough. Barring consent, the government simply would have secured a list of lease-holders for the complex, recognized the name on the apartment's lease (Esdras Freitas – the ex-wife of a TelexFree founder and a name already known to the agents), and secured a search warrant for that apartment.

As to Rocha's cellular telephone, the agents seized when he was arrested, but the government has never searched it. The arresting agents secured access to the phone by putting it into airplane mode and then into a Farraday bag, after which it was entered into evidence pending a search warrant (which the government agrees is required).

Finally, if the Court holds an evidentiary hearing on Rocha's motion, Rocha's affidavit should be stricken unless he submits to cross-examination. Rocha cannot put his own self-serving testimony into the record but then block the government from testing his claims on cross-examination. *See United States v. Phillipos*, 849 F.3d 464, 468-69 (1st Cir. 2017) (affirming district court order making evidentiary hearing conditional on defendant agreeing to be cross examined about his affidavit). "A trial judge may strike a witness's direct testimony if he flatly refuses to answer cross-examination questions related to 'the details of his direct testimony,' thereby undermining the prosecution's ability 'to test the truth of his direct testimony.'" *United States v. Baskin*, 424 F.3d 1, 3 (1st Cir. 2005) (affirming district court order striking defendant's affidavit in support of motion to suppress).

**FACTUAL BACKGROUND**

Rocha has given the Court a full copy of the video recording of Rocha's interviews. The government joins Rocha in urging the Court to simply watch it.[1] Beyond the video, the basic outline of events on January 4, 2017, is in Rocha's motion; below the government adds or emphasizes certain details of the events that day.

**I.   ROCHA'S RELATIONSHIP WITH HIS CO-CONSPIRATORS**

Rocha is a close associate of Carlos Wanzeler and Leonardo Casula, two men who helped perpetrate the TelexFree pyramid scheme between February 2012 and April 2014. The TelexFree pyramid scheme is one of the largest ever prosecuted, inflicting financial losses on 1,887,000 investors worldwide, who lost a total of $3,045,000,000. In April 2014, the day agents searched TelexFree's offices, Wanzeler fled to Canada and then to Brazil, where he now lives free from the risk of extradition. His abrupt departure, however, caused him to leave behind tens of millions of dollars he had laundered from TelexFree accounts. (Wanzeler's co-defendant, James Merrill, did not flee, and is now in prison. *See United States v. James Merrill*, No. 14-CR-40028-TSH.)

This is where Rocha comes in, and he is not quite the innocent lamb portrayed in his motion. In his memorandum Rocha allows that he has visited the United States "on a few occasions," *Mem. in Support of Mtn. to Suppress* at 3, but fails to note that on several of those occasions he was here to help conceal and launder millions of dollars for Wanzeler. *See Transcript of Video Recordings* ("*Transcript*") at 27-35.[2] Moreover, Rocha knew it was TelexFree money.

---

[1] The Court should have two audio files containing Rocha's interviews, one for the initial interview and one for the interview after the break. The government cites the video recording in this memorandum using the citation, "*Video Recording* File [1 or 2] at [time stamp]."

[2] A transcript of the video recordings is attached as Exhibit B to Rocha's motion. The government has not yet commissioned its own translation, but accepts this one for purposes of this motion – Rocha's

4

*Id.* at 55. On his most recent trip, however, the money launderer retained by Rocha's Brazilian co-conspirators turned out to be a CW. After delivering $2,200,000 to the CW (the amount Rocha usually laundered on these trips, see *Transcript* at 35), he delivered another $45,000 to Wanzeler's wife before being arrested.

## II. ROCHA'S FIRST INTERVIEW

After his arrest, Rocha was transported by car to DHS's offices in Boston. Once there he was seated in a conference room ands advised of his Miranda rights in Portuguese, including from a Miranda card written in Portuguese. He then initialed the card. The translating agent told Rocha he was free to stop answering questions at any time. *See Transcript* at 1-2; *Video Recording* File 1 at 0:00 – 1:30; Exhibit A (Miranda card in Portuguese, with Rocha's initials). As is obvious from the recording, at no time did the agents raise their voices or take steps to intimidate Rocha. Nor was Rocha "interrogated" by "five or six agents." *Def. Mem.* at 4. Two agents – DHS TFO Julio Del Figueredo and DHS SA Aaron Lindaman – conducted the interview, with occasional input from DHS SA Paul Melican.

As is clear from the transcript and the recording, Rocha had no problem understanding TFO Julio Del Figueredo, the agent acting as translator: at no point in either interview did Rocha say that he did not comprehend a question, and Rocha's answers were responsive, that is, sensical, in light of the questions asked over a two hour period. In short – and again as both video and transcript show by simply reviewing them – no material aspect of the interview was "marred" by "inaccuracies and confusion." *Def. Mem.* at 4. Also, as Rocha notes, he understands some English, having attended English classes in Boston in 2016. *See Def. Mem.* at 3.

---

counsel notes that it was created by a court-certified interpreter. If the Court holds an evidentiary hearing, the government may retain a second interpreter to confirm the accuracy of portions of the transcript.

The recording also shows, however, that at points during the first interview Rocha answered reluctantly, telling the agents, "I prefer not to answer," or "I'm afraid to say something . . . that can be used against me." *Id.* at 5. Rocha also lied during most of the interview, claiming to know nothing about a stash of money or what was in the suitcase he delivered to the CW. *See, e.g., Transcript* at 4. Rocha claims that in the first 14 minutes he "asked for an attorney at least five times," *Def. Mem.* at 5, but this is misleading. About five minutes into the interview, Rocha referred to a lawyer but stopped short of asking for one, appearing to refer to having wanted a lawyer at an earlier time. *See Transcript* at 7; *Video Recording* File 1 at 5:50.[3] He then referred to counsel in the present tense, saying "So because I am scared, I pref-, I nee-, I prefer to speak with a lawyer to know of my situation here." *Id.* at 7. In translation to the other agents, however, the request appeared more equivocal ("[H]e wants to see if he can get a lawyer, if he has to get a lawyer, or what, he doesn't know what to do [unintelligible]."). *Id.*; *Video Recording* File 1 at 6:30.

Questioning continued. The agents told Rocha that they already knew what happened and that the maximum penalty for money laundering is 20 years in prison. Rocha replied, "I want to help," *Transcript* at 8, *Video Recording* File 1 at 7:50, but wanted the agents to understand that he was at a disadvantage being in a foreign country. *Transcript* at 8-9. The agents then directly asked Rocha where they could find the rest of the money. Rocha claimed not to know, and for several minutes the group went over the details of Rocha's movements that day. As the video shows, Rocha was composed throughout. The agents eventually implied that Rocha was lying, *Transcript* at 14-15, after which Rocha complained that he had "never been through a situation like this" and

---

[3] "I wanted like, a lawyer, because, so it can be good for both sides. Because I, I know I have a lot to lose and what I am scared of in this moment, which you said you can see, it's because it's really not something that is of my nature, understand?"

6

"I'm with uh uhuh my mind flying *that's why I asked for a lawyer*." *Id*. at 15 (emphasis added); *Video Recording* File 1 at 13:30. TFO Del Figueredo relayed this to the others, telling them, "he wants a lawyer" (13:48). SA Lindaman said, "He wants a lawyer? He doesn't want to talk to us anymore?," which Rocha confirmed ("I prefer if you don't" (13:55)). The agents stopped questioning him. *Transcript* at 15-16; *Video Recording* File 1 at 14:10. That is, the agents stopped questioning him within about 20 seconds of understanding that Rocha was invoking his right to counsel.

### III. THE 30 MINUTES BETWEEN THE FIRST AND SECOND INTERVIEWS

After the interview ended, Rocha was left in the conference room while the agents arranged to transport him for the night. An agent who had not been involved in the questioning stayed with Rocha – a necessary step because the conference room was not secure. No one talked to Rocha in this period. Rocha became more upset, however, such that the agents could hear him sobbing across the office in their desk area. At some point someone gave him some water.

Having completed the necessary arrangements for transport with a supervising agent, after about 30 minutes TFO Del Figueredo re-entered the room and told Rocha he would soon be taken to Brookline for the night. Rocha describes the subsequent exchange as the agents "disregard[ing] Rocha's previous invocation of the right to counsel" and making "a series of threats and promises to break Rocha's will and coerce him," *Def. Mem*. at 5, but this is a rank mischaracterization. In response to being told about the transport, Rocha became more upset and wanted to know why he had to go to jail. He began to explain that he was just doing someone a favor and referred to his wife. Del Figueredo responded by asking him if he wanted to talk more with the agents. Rocha said yes, and Del Figueredo asked him again, to confirm. Del Figueredo relayed this to the other agents, some of whom re-entered the room. In an effort to calm Rocha, the agents told him they

7

would talk to the prosecutor on his behalf and that maybe he could be released that night. At some point, Del Figueredo or another agent told Rocha it was his last chance to cooperate with the authorities. Upon re-entering, Agent Lindaman also asked Rocha if he wanted to talk to the agents again, which Rocha confirmed.

Lindaman restarted the camera. After recording began, Rocha was Mirandized again – in Portuguese – including again being given the Miranda warnings written in Portuguese. He acknowledged understanding the warnings and agreed to talk to the agents. *Transcript* at 16.

### IV. ROCHA HELPED THE AGENTS LOCATE THE APARTMENT, CONSENTED TO A SEARCH, AND SIGNED A CONSENT-TO-SEARCH FORM AFTER IT WAS EXPLAINED TO HIM PARAGRAPH BY PARAGRAPH

Based on statements by co-defendant Leonardo Casula and another co-conspirator during the underlying investigation, Carlos Wanzeler hid vast sums of TelexFree money in the greater Boston area – cash that belonged to millions of TelexFree victims. Rocha had brought $2,200,000 to the CW, but the agents knew there was more to be found and they asked Rocha about it early in the second interview. The agents tone and bearing was conversational throughout – which, yet again, is obvious from simply watching the recording. They first asked Rocha where he got the money he gave the CW; Rocha said he did not know the address, but tried to describe the location. *Transcript* at 17-19; *Video Recording* File 2 at 1:05 – 3:15. The agents then asked Rocha where to find the key and who lives in the apartment. Rocha told them the key was in his rental car and that no one lived in the apartment – it had been rented to hold the money. *Id*. at 19-20; *Video Recording* File 2 at 3:15 *et seq*. Rocha told them there was "around twenty million" there. *Id*. at 19.[4]

---

[4] Later in the interview Rocha said Wanzeler had the apartment rented "as a favor to [Rocha]," "for [Rocha] to live there." *Transcript* at 34.

8

The agents tried to secure permission to search at this point, but with ambiguous results, because Rocha became upset. When directly asked for permission to enter the apartment, Rocha first replied, "What?," and then said, "With, with the guarantee, for the love of God," as he put his head down and cried. *See Transcript* at 21; *Video Recording* File 2 at 4:30 – 5:20. On the issue of "threats," "coercion," "intimidation," and "breaking his will," the government notes that, in response to Rocha's obvious distress the agents did not press the advantage but instead comforted him. Agent Paul Melican, who came and went during the interview, asked Rocha to remember that the money would go back to the people "who were ripped off by Carlos [Wanzeler]." The agents told Rocha he was doing the right thing. *Id*. at 22; *Video Recording* File 2 at 5:20 – 6:00. The agents then left the issue alone and moved on to other questions for an extended period. *Video Recording* File 2 at 6:00 – 19:05. They also got Rocha a bottle of water, for which he thanked the agent. *Id*. at 10:15 – 10:30.

Agent Lindaman later picked up the thread again, telling the agents, "It's kind of important that we get this apartment figured out." *Transcript* at 36; *Video Recording* File 2 at 19:05. The agents again confirmed that (a) the apartment was rented for Rocha, (b) he controlled it, and (c) he was the only one with a key. *Id*. at 36-37. Agent Lindaman asked TFO Del Figueredo to have Rocha sign a consent form for the search. *Id*. at 37; *Video Recording* File 2 at 19:25. Del Figueredo told Rocha – "He is going to give you a consent paper so we can get into your apartment" – and Rocha agreed ("Ok") while nodding. *Id*. While waiting for the form, Agent Melican made small talk with Rocha (in English, though Rocha's English was clearly quite limited), followed by some additional questions translated by Del Figueredo.

A few minutes later the agents ask Rocha for help confirming the precise apartment address. *Transcript* at 55-58; *Video Recording* File 2 at 34:15. After the agents tried to figure it

9

out, Rocha offered to just find it on Google. *Id*. at 56; *Video Recording* File 2 at 35:40. Del Figueredo and Rocha looked at a phone together, eventually establishing the correct address and building. *Id*. at 56-58; *Video Recording* File 2 at 35:40 - 37:30. The agents then filled in the address on the consent form, and Del Figueredo went over the form with Rocha – paragraph by paragraph. *Id*. at 59-61; *Video Recording* File 2 at 37:30 – 42:20. Rocha then signed the form. *See also* Exhibit B (signed consent form). Rocha admitted in his affidavit that he understood the form's significance: he said that Del Figueredo "translated that it was an authorization for them to enter the apartment and I signed it." *Rocha Affidavit* ¶ 20.

# ARGUMENT

I. **THE COURT NEED NOT RESOLVE ISSUES RELATED TO ROCHA'S FIRST INTERVIEW, BECAUSE THE GOVERNMENT DOES NOT INTEND TO USE THOSE STATEMENTS AT TRIAL**

As described above, in his first interview with the agents Rocha knowingly and voluntarily waived his Miranda rights, but soon after became reluctant to talk. After a few minutes, he said he was afraid to say something that could be used against him and, soon after, referred to getting a lawyer. The agents did not "ignore" Rocha's request for a lawyer; Rocha was at first equivocal, followed by an error in translation that misled the agents leading the interrogation. Once the lead agents were clear that Rocha was invoking his right to counsel, they stopped talking to him.

The government acknowledges that the issue is a close one. Questioning must stop if the defendant "indicates in any manner and at any stage of the process that he wishes to consult with the attorney before speaking[.]" *Miranda v. Arizona*, 384 U.S. 436, 44-445 (1966). But a clear invocation of the right is needed. The defendant must invoke the right clearly enough that a reasonable officer would know with certainty that he or she wants counsel. *See Davis v. United States*, 512 U.S. 452, 459 (1994). If the statement is "ambiguous or equivocal in that a reasonable

officer in light of the circumstances *would have understood only that the suspect might be invoking the right to counsel*," the agents need not stop asking questions. *Id*. (emphasis added). Moreover, if the statement is equivocal or tentative, agents are *not* obligated to clarify whether the individual is only considering representation or actually wants a lawyer:

> Of course, a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney . . . . *But we decline to adopt a rule requiring officers to ask clarifying questions.* If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

512 U.S. at 461-462 (emphasis added); *see also, e.g., Obershaw v. Lanman*, 453 F.3d 56, 64 (1st Cir. 2006); *United States v. Dudley*, 804 F.3d 506, 514 (1st Cir. 2015).

When Rocha said during the first interview, "So because I am scared, I pref-, I nee-, I prefer to speak with a lawyer to know of my situation here," Del Figueredo's translation to the lead agents was unwittingly more equivocal than Rocha's actual statement, and questioning continued. *Transcript* at 7. But that is obviously the government's responsibility, not Rocha's. In any event, Rocha lied throughout his first interview (and so made few incriminating statements) and the government does not intend to use the interview at trial.

II. **AFTER THE FIRST INTERVIEW, ROCHA RE-INITIATED A SUBSTANTIVE EXCHANGE WITH THE AGENTS, AFTER WHICH THEY CONFIRMED HIS DESIRE TO TALK, RE-MIRANDIZED HIM, AND CONDUCTED A SECOND INTERVIEW**

Rocha's second interview with the agents is clearly admissible. After the transfer paperwork was complete, Del Figueredo re-entered the conference room to tell Rocha what was going to happen. This was not "interrogation" by any stretch of the imagination. But Rocha, upset, responded to this information by asking why he had to go to jail, insisting that he was only

doing someone a favor, and saying something about his wife. In short, *Rocha* reinitiated substantive conversation with the agents, and not vice versa.

If the *agents* had reinitiated substantive communications after Rocha ended the first interview, that would have violated the prophylactic rule created in *Edwards v. Arizona*. (This would be so even though the agents re-Mirandized Rocha.) Once a defendant invokes his right to counsel, "further interrogation may not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *United States v. Thongsophaporn*, 503 F.3d 51, 55–56 (1st Cir. 2007) (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)). This is a sensible rule, intended to prevent the police from repeatedly badgering a suspect into waiving his Miranda rights. *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990) (making this point).

"Interrogation" includes both "express questioning" and its "functional equivalent," *United States v. Davis*, 773 F.3d 334, 339 (1st Cir. 2014), and the test for "functional equivalence" is objective, not subjective.[5] But interrogation does not include routine communications like administrative questions or comments. *See, e.g., United States v. Sanchez*, 817 F.3d 38, 45 (1st Cir. 2016) (holding police free to ask routine booking questions despite invocation). Questions "reasonably related to the police's administrative concerns . . . fall outside the protections of Miranda and the answers thereto need not be suppressed." *Pennsylvania v. Muniz*¸ 496 U.S. 582, 601–02 (1990). Officers are also allowed to describe charges and evidence against defendants who have invoked the right to counsel. *See United States v. Conley*, 156 F.3d 78, 81-82 (1st Cir. 1998) (holding postal inspector allowed to detail evidence against suspect who invoked right).

---

[5] The test "does not turn on the subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances." *United States v. Taylor*, 985 F.2d 3, 7 (1st Cir. 1993). The "'possibility' that a suspect may make an incriminating statement" is not enough to transform a statement into interrogation. *Id.* (quoting *Arizona v. Mauro*, 481 U.S. 520, 528–29 (1987)).

If, in the absence of "interrogation," the defendant reinitiates contact, there is no violation of the *Edwards* rule, and that is what happened here. Suspects can waive their right to counsel and talk to police at any point – including after they have previously invoked the right. *See Minnick v. Mississippi*, 498 U.S. 146, 156 (1990) ("*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested . . . ."). The First Circuit applies a two-step analysis: first, the defendant must be the one to "initiate" the conversation that leads to the admission and, second, the subsequent renewed waiver must be knowing and intelligent. *See Judd v. Vose*, 813 F.3d 494, 497 (1st Cir. 1987).

A defendant "initiates" further communication by "evinc[ing] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality op.); *see also id.* at 1055 (Marshall, J., dissenting) (agreeing with plurality on definition of initiation). Defendants do not have to do much to "evince" such a desire.[6] *See, e.g., id.* at 1042 ("What is going to happen to me now?" initiated further conversation); *Bachynski v. Stewart*, 813 F.3d 241, 243 (6th Cir. 2015) ("I want to talk to you" held sufficient); *United States v. Thongsophaporn*, 503 F.3d 51, 56 (1st Cir. 2007) ("What is going on?" held sufficient).

Here, Rocha did not merely "evince," a "willingness" to talk more about his role in the conspiracy, he simply began talking about his role in the conspiracy. In response to being told of the impending transport, he asked why he had to go to jail and said he was just doing someone a favor. In response, Del Figueredo acted appropriately: instead of asking substantive follow-up questions (that is, engaging in *interrogation*), he clarified that Rocha really wanted to talk again, brought in the other agents, and had Rocha re-Mirandized. The government acknowledges that,

---

[6] The *Merriam-Webster Dictionary* defines "evince" as "to constitute outward evidence of," or "to display clearly." *See* https://www.merriam-webster.com/dictionary/evince.

between Rocha's re-initiation and the renewed Miranda warnings, there was more talk than was ideal – because Rocha seemed upset, the agents told him that if he cooperated they would tell the prosecutor about it and that he might be released that day. But these statements were not "interrogation," and did not vitiate Rocha's re-initiation of substantive discussions.

### III. ROCHA GAVE KNOWING, VOLUNTARY CONSENT TO SEARCH THE APARTMENT, AND THE FRUITS OF THAT SEARCH ARE ADMISSIBLE REGARDLESS OF WHETHER THE UNDERLYING STATEMENTS ARE SUPPRESSED

As summarized above, Rocha's consent to the search of the apartment was entirely knowing and voluntary. The video recording alone makes this obvious: the agents did not threaten or intimidate him; his will was not otherwise overborne; he was composed and calm; the consent form was explained at length; and – as he admits in his affidavit, *Rocha Affidavit* ¶ 20,[7] – Rocha understood what he was being asked to sign, and signed it. This after Rocha confirmed that only he had access to the apartment, told the agents where to find the keys, and helped the agents find the apartment on Google Maps.[8]

So the consent was entirely valid. *And this would remain so even if Rocha's statements were suppressed under the Fifth Amendment*. That is, there is no "fruit of the poisonous tree" analysis for physical evidence derived from a *Miranda* or *Edwards* violation. This is black letter law: "[T]he physical fruits of an otherwise voluntary statement are admissible against a defendant even if a *Miranda* warning was wrongly omitted." *United States v. Parker*, 549 F.3d 5, 10 (1st Cir.

---

[7] "Agent Del Figueredo translated that it was an authorization for them to enter the apartment and I signed it."

[8] The government must prove by a preponderance of the evidence that the consent was voluntary and not coerced. *See United States v. Bey*, 825 F.3d 75, 80 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 603 (2016). Whether consent was voluntary depends on "the totality of the circumstances attending the interaction between defendant/third party and the searching officers." *United States v. Vanvliet*, 542 F.3d 259, 264 (1st Cir. 2008).

2008) (citing *United States v. Patane*, 542 U.S. 630, 641–42 (2004)). If the Fourth Amendment is violated, the fruits of the search are suppressed, but if the Fifth Amendment is violated, the only sanction is that the defendant's statements cannot be used at trial. *Patane*, 542 U.S. at 641–42; *see also United States v. Hinkley*, 803 F.3d 85, 91 (1st Cir. 2015) (applying *Patane*). Because the prophylactic rule in *Edwards* (and in *Miranda*) gives suspects a "second layer" of protection beyond the baseline of the Fifth Amendment, *Edwards* violations do *not* result in suppression of physical evidence derived from an otherwise voluntary statement. *See McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991).

Courts have consistently applied this rule. For example, the Fifth Circuit's decision in *United States v. Gonzalez-Garcia* presented facts similar to this case: after Gonzalez requested a lawyer, agents did not stop the interrogation and instead asked him for consent to search. 708 F.3d 682, 684-85 (5th Cir. 2013). Gonzalez signed a consent form, "turned over a key to the house and instructed agents on how to open the door." *Id*. at 685. Agents found over two tons of drugs in the house, which were later admitted at trial. *Id*. On appeal Gonzalez argued that the drugs should have been suppressed "as the fruit of an *Edwards* violation." *Id.* at 686. The Fifth Circuit disagreed, holding that "even if there was an *Edwards* violation, suppression would be inappropriate," as the drugs were "physical, nontestimonial evidence." *Id.* at 687.

Similarly, in *Howard v. Moore*, Howard refused to speak with law enforcement and invoked his right to counsel. *See* 131 F.3d 399, 4109 (4th Cir. 1997). But when Howard, still in custody, met with his probation officer, he confessed to two murders. *Id*. The probation officer called other law enforcement agents, and Howard repeated his confession. *Id*. Though the probation officer herself did not testify, Howard tried to suppress the statements of the two agents who heard the second confession. *Id*. at 411. The Fourth Circuit, however, ruled that Howard's

15

second confession was admissible because, via the probation officer, *Howard* had reinitiated contact with the two agents and not the other way around. *Id*. at 413.[9]

Also note that *Miranda* and *Edwards* do not apply to a defendant's "non-interrogative interactions" with officers in the first place, *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009), and a request for consent to search is non-interrogative. *See, e.g., United States v. Kellogg*, 306 F. App'x 916, 923 (6th Cir. 2009) (holding that because "request to search cannot be reasonably expected to elicit anything more than a 'yes' or 'no,'" it is not interrogation subject to the protections of *Miranda* and *Edwards*). "[A] consent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation." *United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir.1993); *United States v. Goodridge*, 945 F. Supp. 359, 368 (D. Mass. 1996) (Freedman, J.) (quoting *Smith*). Every court of appeals to address the issue has held that asking a defendant for consent to search is not "interrogation" that violates *Miranda* or *Edwards*.[10] *See also Goodridge*, 945 F. Supp. at 369 (holding consent to search valid despite failure to provide Miranda warnings).

---

[9] *See also, e.g., Oregon v. Elstad,* 470 U.S. 298, 308 (1985) (concluding that the "fruit of the poisonous tree" doctrine did not apply to a suspect's second statement, made while in custody as a result of unwarned first statement obtained in violation of Miranda*,* because there was no actual infringement of the suspect's constitutional rights); *Michigan v. Tucker,* 417 U.S. 433, 445–46 & n. 19 (refusing to apply "tainted fruits" doctrine to the testimony of a witness whose identity was discovered as a result of a statement obtained in violation of Miranda); *United States v. Elie,* 111 F.3d 1135, 1141 (4th Cir. 1997) (rejecting "application of the 'fruit of the poisonous tree' doctrine to physical evidence discovered as the result of a statement obtained in violation of Miranda"); *Correll v. Thompson,* 63 F.3d 1279, 1289–91 (4th Cir. 1995) (refusing to apply "tainted fruits" doctrine to a third confession obtained as a result of two earlier confessions obtained in violation of *Edwards* ).

[10] *See United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014), as corrected (Feb. 11, 2014); *United States v. Knope*, 655 F.3d 647, 654 (7th Cir. 2011); *Kellogg*, 306 F. App'x at 923; *United States v. Stevens*, 487 F.3d 232, 243 n.3 (5th Cir. 2007); *United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994).

**IV. EVEN WITHOUT ROCHA'S CONSENT, THE AGENTS WOULD HAVE ACCESSED THE APARTMENT BY SECURING A SEARCH WARRANT BASED ON INFORMATION ALREADY IN THE GOVERNMENT'S POSSESSION AND OBTAINABLE BY OTHER MEANS**

Even if Rocha had not consented to the search, the agents would have soon secured a search warrant for the apartment where the money was found. Earlier in the day, after Rocha had given the CW $2,200,000, agents followed Rocha to the apartment complex, where he stayed for an extended period. The agents surmised that the rest of the money was in the apartment complex, but they did not know the unit number. Had Rocha refused to consent to the search, the government would have issued a forthwith subpoena to the apartment complex for the names of all lessees. That list would have included the name "Esdras Freitas," the lease holder for the apartment Rocha used.[11] Freitas was already known to the agents – she was the ex-wife of Carlos Costa, one of the three co-conspirators who founded TelexFree. Upon locating her name on the list and the corresponding apartment, the agents would have had more than enough probable cause for a search warrant.

A demonstrable "independent source" for the evidence, which inevitably would have led to its discovery, defeats a motion to suppress. The exclusionary rule is not intended to be a "windfall for a defendant," *United States v. Soto*, 799 F.3d 68, 80 (1st Cir. 2015), but only to erase any advantage law enforcement has gained from *misconduct*. *See Nix v. Williams*, 467 U.S. 431, 443-44 (1984). Consequently, "information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir. 1986). This includes "rediscovery of tangible evidence already discovered and the reseizure of tangible evidence already seized." *Soto*, 799 F.3d at 80.

---

[11] The government has subpoenaed the lease documentation for the apartment, which confirmed that Ms. Freitas was indeed the lessee.

**CONCLUSION**

For the foregoing reasons, Rocha's motion to suppress should be denied.

Respectfully submitted,

William D. Weinreb
Acting United States Attorney

By:   /s/ *Andrew Lelling*
      Andrew E. Lelling
      Assistant U.S. Attorney

Date:   June 27, 2017

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, on June 27, 2017.

 /s/ *Andrew Lelling*
Andrew E. Lelling