UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NO.  17-10048-LTS

UNITED STATES      )
              )
v.                )
              )
CLEBER RENE      )
RIZERIO  ROCHA,    )

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The Defendant, Cleber Rene Rizerio Rocha ("Mr. Rocha"), by and through undersigned Counsel, respectfully submits this memorandum in conjunction with his sentencing scheduled for December 20, 2017.  Mr. Rocha submits that the Guidelines are more appropriately calculated with a Total Offense Level 21, Criminal History Category I, and a Guideline Sentencing Range of 37-46 months.  However, in light of the considerations set forth in 18 USC §3353(a)(2), the unprecedented recovery of Nineteen Million Two Hundred Thousand Dollars ($19,200,000.00) must be credited to Mr. Rocha.  The recovery of these funds, which were made available for the Telexfree victim compensation fund, provided funds available for restitution to thousands of victims.  Mr. Rocha respectfully submits a sentence of 14 months imprisonment, followed by immediate voluntary deportation to Brazil, will be "sufficient, but not greater than necessary" to achieve the purposes of the Sentencing Reform Act.

**I.   INTRODUCTION**

It is unimaginable for Mr. Rocha, as well as his wife and family, that he has been incarcerated in a prison in the United States for a year, and that he also faces a serious prison sentence in this matter. This is an almost unthinkable scenario given the quality of the person Mr. Rocha is, how he has lived a law-abiding lifestyle, and the circumstances of this unfortunate

incident wherein he agreed to do a favor for a friend without a full understanding of the ramifications. And yet the reality is that Mr. Rocha has become yet another casualty of the Telexfree scheme, an intricate criminal enterprise run by Carlos Wanzeler, James Merrill, Leo Casula and others which has already victimized more than 1.8 million people. Mr. Rocha unwittingly subjected himself to this scenario by agreeing to perform a favor for someone he considered a friend, and without knowledge of the laws of the United States or the consequences, he engaged in conduct which placed him in violation of serious federal criminal laws and facing dire sanctions.  Mr. Rocha now stands as a convicted felon who has lost his reputation as an honest, hard-working and forthright citizen of Brazil and has brought humiliation both to himself and his family.

As the attached letters set forth, Mr. Rocha is a decent and honorable man who was raised in a loving family headed by his mother, Rose Mary Rizerio Rocha, who along with his brothers and sisters developed into law-abiding citizens of Brazil. Mr. Rocha has absolutely no prior involvement in the criminal justice system either in his home country of Brazil or in the United States. He comes from modest means and was raised in the city of Brumado, state of Bahia, Brazil where he was educated in the public-school system and later attended Vilha Velha University where he studied information technology. By all measures, Mr. Rocha is a loving son, husband and brother, however his untainted lifestyle and background have been tarnished based on the relationship with his first employer right after college with Montage, a company operated by Carlos Wanzeler.

It is against this backdrop, including the defendant's history of being a loving family man as detailed in the letters of recommendation, who otherwise has an impeccable background and a complete lack of connection with any criminal enterprise including the Telexfree scheme, that

the defendant respectfully requests a sentence of Fourteen (14) months which is entirely proper and justifiable in this case. This sentence would appropriate for a person who made a flawed decision to do a favor for a "friend" while lacking a full understanding of the circumstances and consequences of his decision and served as a minimal participant.   A longer period of incarceration is not necessary for specific deterrence or general deterrence as a review of Mr. Rocha's life amply demonstrates that he did not knowingly or intentionally commit himself to such dire circumstances. Nor did he benefit financially from his involvement in the matter.  As the background and the PSR and letters demonstrate, no further period of incarceration is necessary to inflict additional punishment and shame on Mr. Rocha. He has lost his business, and he now faces financial ruin.   His reputation has been ruined by the press in Brazil, and he has been humiliated both before his family and before his community. Against this backdrop, the defense respectfully submits that he further prison sentence is not necessary to "punish" Mr. Rocha, particularly with proper understanding of his true conduct and roll in this case.

It is uncontested by the government that there are no victims who lost money as a result of Mr. Rocha's conduct.  The funds recovered by government agents, and the unprecedented recovery of Nineteen Million Two Hundred Thousand Dollars ($19,200,000.00), provided the government with funds sufficient to make restitution to over Ten Thousand (10,000) victims of the Telexfree scheme. In light of his conduct, in addition to the defendant's complete lack of prior record, the defense respectfully urges the court to impose the most compassionate sentence possible, and respectfully submits that a sentence of no more than Fourteen (14) Months in jail would be entirely consistent with the objectives of section 3553 (a), and the parsimony principle expressed therein that the court should ask impose a sentence sufficient, but not necessary but not more than necessary, to comply with the purposes of 18 U.S.C §3553 (a).

## II. **BACKGROUND**

On January 5, 2017, Mr. Rocha was charged via a criminal complaint with Conspiracy to Launder Money in violation of 18 U.S.C. §1956(h).   Dkt. #1.   An indictment was obtained on March 7, 2017 charging Mr. Rocha with one count of Conspiracy to Launder Money in violation of 18 U.S.C. §1956(h) and one count of Money Laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i).   Dkt. #13.   The indictment contained the following specific allegations against Mr. Rocha and the co-defendant Leonardo Casula Francisco ("CASULA"):

- The primary purpose and objective of the conspiracy charged was to transfer proceeds from a wire fraud, specifically, proceeds of the pyramid scheme conducted through the entity Telexfree from the United States to Brazil;

- The manner and means by which the conspirators accomplished the objectives of the conspiracy, included among others:

  a. Based in Brazil, CASULA sought the assistance of Person A to transfer the proceeds of a wire fraud scheme in the United States to Brazil while concealing or disguising the true nature, source, ownership and control of those funds;

  b. CASULA negotiated with Person A to take personal possession of a portion of the funds in the United States and transfer them, in increments, to Hong Kong and then to Brazil;

  c. CASULA directed another person, Mr. Rocha, to travel to Massachusetts from Brazil to transfer the funds to the possession of Person A for transfer to Hong Kong and Brazil.

- In or about mid-2015, initially through an intermediary, CASULA asked Person A for help transferring out of the United States cash proceeds of the Telexfree fraud that remained in the greater Boston area;
- CASULA and Person A agreed that the proceeds would be delivered to Person A in increments by a person sent to the United States for that purpose.   Person A would then send the proceeds, via domestic accounts Person A controlled, to accounts in Hong Kong, where the proceeds would be converted to Brazilian reals.   From there, the proceeds would be transferred to Brazil;

- In or about December 2016, CASULA sent Mr. Rocha to the United States from Brazil for the purpose of delivering a portion of the proceeds to Person A;

- On or about January 4, 2017, Rocha met Person A in a parking lot in Hudson, Massachusetts, and gave to Person A a suitcase containing about $2,200,000.00 in proceeds.

Mr. Rocha was arrested in this matter on January 4, 2017 and he has been detained since his arrest.  Although separated from his wife and family in Brazil, Mr. Rocha has been a model detainee, and there have been no problems or issues during his detainment at the Donald W. Wyatt Detention Facility in Central Falls, Rhode Island.  On October 19, 2017, Mr. Rocha entered a change of plea of guilty to both counts of the Indictment.  See Dkt. #56.  There is no plea agreement in this case.  Mr. Rocha is currently schedule for sentencing on December 20, 2017 before this Honorable Court.

*General Background and Context*.

1. Mr. Rocha's Personal History and Characteristics .[1]

Cleber Rene Rizerio Rocha is twenty-eight (28) years old, and he has lived his whole life in Brazil.  He speaks, reads, writes, and understands his native language of Portuguese.  Mr. Rocha has traveled to the United States on a few occasions. He was born on May 4, 1989 in the city of Brumado in the state of Bahia, Brazil. He is the son of Rose Mary da Silva Rosario and Joao Batista Silva Rocha. Mr. Rocha lived his childhood, adolescence and youth in the city of the Brumado, where he was known as a friendly and charismatic child, who later developed into a

---

[1] This Court is no longer straight-jacketed regarding the types of information it should consider in imposing a reasonable sentence. 18 U.S.C § 3661 clearly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statute, like the parsimony principle contained in 18 U.S.C § 3553 (a), now assumes greater significance in the post-Booker sentencing regime.

hard-working and studious young man. He has no history of ever causing trouble or concerns to his parents and he has no prior involvement in the criminal justice system in Brazil, the United States or anywhere else.  Mr. Rocha grew up reading, writing and speaking Portuguese. In September 2016, Mr. Rocha married Christhien Alves Gomes Rocha and resides with his wife in Vila Velha, Brazil.

Mr. Rocha grew up attending an evangelical church in his hometown of Brumado and during his adolescence earned good grades in school. His participation, dedication in school led to his being loved by his teachers and classmates and many of them have kept friendship with Mr. Rocha about their friendship. Mr. Rocha has no history of addiction to alcohol, cigarettes, or drugs. As the letters of recommendation make clear, he is a quiet young man, and an example to friends and others in his church, and he is the pride of his parents and family.

As a young man, his daily routine involved taking courses and diligently studying, being involved in church events and working to help others. During his last two years of school, his parents were no longer able to afford to keep him in the same private school. However due to his proven record of dedication to his studies, the school principal intervened and donated a scholarship to the family.  This allowed Mr. Rocha to complete high school and earn his degree from the school he had attended and dedicated himself.

After completing high school, Mr. Rocha went to live with a friend in Espirito Santo in order to attend college at Vilha Velha University where he studied Information Technology Management, a field he long desired to study.  Mr. Rocha's family also moved to Espirito Santo which financially allowed Mr. Rocha to attend college. Soon after leaving college in 2007-2008 before he earned his degree, and consistent with the local practice, Mr. Rocha answered an advertisement in the local newspaper and began to work under a formal contract. At that time

Mr. Rocha accepted a job with a marketing company, Montage, a local Brazilian company owned by Carlos Wanzeler.  Wanzeler is known locally in Brazil as a wealthy and powerful entrepreneur, and he owns a number of businesses, including several multilevel marketing companies.  Thereafter, Mr. Rocha worked for several technical companies performing data communication and computer system maintenance.

In 2010 Mr. Rocha met his girlfriend, Christhien who is now his wife at the Presbyterian Church where they remain members to this day. Mr. Rocha has always been known as the Pastor's right-hand man, a leader of the youth, and dedicated to the work the church. Truly,  he is responsible, organized,  and sincere with his beliefs. He is known as a person of character, trusted by all and remains a person who loves to help others.  Mr. Rocha wanted to learn to speak English fluently, so he struggled to get an "F1" student visa. In June 2016 he came to Boston Massachusetts to study at "Talk International" an English school in Boston. He returned to Brazil to get married in fall  2016.  In or about May 2016 until his arrest on January 4, 2017, Mr. Rocha owned and operated Rocha's Services where he provided computer system maintenance to his customers, earning an honest living.  With his earnings, he purchased a condominium for his mother and assisted her in paying the mortgage.

As noted, Wanzeler was one of Rocha's Services' customers, and Mr. Rocha provided computer system maintenance to several of Wanzeler's companies.  Mr. Rocha was aware that Wanzeler owned businesses outside of Brazil, including a business in the United States named Telexfree.  Mr. Rocha was neither employed by nor had involvement in the operations of Telexfree.  It is undisputed that Mr. Rocha did not assist in any manner or participate in the Telexfree scheme.  Further, Mr. Rocha was not paid or compensated to help Wanzeler – his downfall was his agreeing to do a favor for someone he believed was his friend.  Without a full

understanding of the laws of the United States, customs, or the ramifications of his fateful decision, Rocha bowed to pressure from Wanzeler and agreed to enter New York and drive to Massachusetts in a rental car to do a favor and deliver United States currency to an individual as directed and orchestrated by Wanzeler and Casula.   And now Mr. Rocha finds himself in a life-changing situation.

## ARGUMENT

### I.   <u>Applicable sentencing principles.</u>

With the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220, 259 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 128 S.Ct. 558 (2007), federal sentencing has undergone dramatic changes, and the sentencing guidelines are no longer mandatory. The sentencing options available to district courts have significantly broadened. *See, e.g*., *United States v. Taylor*, 532 F.3d 68, 69 1st Cir. 2008) ("The Court's decision in *Gall,* combined with its decisions and *Kimbrough*…. and *Rita v. United States*, 120 7S.Ct. 2456, (2007), makes clear that in the post-*Booker* world, district judges are empowered with considerable discretion in sentencing…."); *United States v. Rodriguez*, 527 F.3d 221, 225 (1st Cir. 2008) ("In *Gall*,…. the Justices expounded further on a district court's authority to vary from the guidelines, emphasizing that district courts have wide latitude in making individualized sentencing determinations"); *United States v. Politano*, 520 F.3d 69, 73 (1st Cir. 2008) ("In view of the Supreme Court's recent decision in Gall, we emphasize that the broad discretion afforded to the district court is paramount"); *United States v. Martin*,  520 .3d 87, 90 (1st Cir. 2008) ("Gall makes clear that courts of appeals must grant district courts wide latitude in making individualized sentencing determinations"); see also *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming sentence which court had twice previously vacated in light of *Gall's*

broader definition of the deference given to district judges' sentencing decisions). No longer are district courts bound by the strictures of the Guidelines or even permitted to presume that the guidelines provide the appropriate sentence in a given case. *Gall*, 552 US at 49–50 (the court "may not presume that the Guidelines range is reasonable").

The guidelines do remain the starting point and the initial benchmark. The Sentencing Reform Act requires the Court to consider guideline ranges, see 18 USC §3553 (a) (4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training in medical care. 18 U.S.C. §3553 (a). Section 3553 (a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.[2]

The sentencing court must compute the guidelines, which are the "starting point in the initial benchmark," but which not may be but which may not be presumed reasonable. *Gall v. United States,* 552 U.S. at 49 – 51 (2007). Then, the court considers the parties arguments, after which it makes an "individualized assessment based on the facts presented," considering all the factors under 18 USC §3553 (a). *Id*. Ultimately, the sentencing judge must select a sentence within the

---

[2] Under *Booker*, this court may consider certain factors that are rejected or ignored by the guidelines. Sentencing courts previously were forbidden from considering, *inter alia*, a defendant's history and characteristics to the extent they involve his mental and emotional condition, USSG §5H 1.3; his education and vocational skills, id. at §5H 1.2, socioeconomic status, id at §5H 1.10; or lack of guidance as a youth, id. at §5H 1.12. These factors can now support a sentence outside the guidelines.

statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress. 18 USC §3553 (a); *see also* 18 USC §3553 (a) (1) – (2).

The First Circuit has summarized the central principles of the post–*Booker* and – *Gall* sentencing procedure described above:

This sentencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case–specific reasons deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual in every case is a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin*, 520 F.3d 87, 91 1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II. <u>Advisory Guidelines Calculation.</u>

### A.  U.S. Probations' USSG Calculation.

Mr. Rocha's guidelines have been calculated by U.S. Probation, as follows:

According to the PSR, "the guideline for 18 U.S.C. §1956 (h) offenses is found in USSG §2S1.1. That section provides that the base offense level is 8 plus the number of offense levels derived from the table found under §2B 1.1 corresponding to the value of the laundered funds. USSG §2S 1.1 (a)(2).  Since the loss amount is more than $9.500,000 million in less than $25,000,000 million, there is a 20-level enhancement." *See* PSR at ¶ 30. Therefore, US Probation has determined that the Base Offense Level is 28. U.S. Probation has included a two- level increase because the defendant was convicted under 18 USC §1956. See PSR at paragraph 41. In addition, U.S. Probation has determined that the offense involves sophisticated laundering and recommends an increase by two levels under USSG §2S1 .1. *See* PSR ¶42.  U.S. Probation notes that the laundering methods in this case coincide with examples found under that section and

specifically Application Note 5(A) to include laundered funds being moved internationally under false pretenses and in a layered fashion. Id.

U.S. Probation has recommended a two-point reduction finding that the defendant was a minor participant in the criminal activity pursuant to USSG §3B1.2 (b).  U.S. Probation's rationale was that the defendant did not receive a substantial monetary gain from his efforts/role in this offense when compared to the other involved parties. See PSR ¶ 44.   U.S. Probation has also provided for a 3-level decrease for acceptance of responsibility, 2 levels pursuant to USSG §3E1.1 (a) and one additional level pursuant to USSG §3E1.1 (B) because the defendant timely notified authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparation for trial in permitting the court to allocate its resources efficiently. *See* PSR ¶¶ 48 &49.[3]  Mr. Rocha has a criminal history score of zero. *See* PSR ¶54.  U.S. Probation has calculated Mr. Rocha's Total Offense Level ("TOL"), as 27, resulting in the guideline sentencing range ("GSR") of 70-87 months. *See* PSR at ¶¶ 50, 86.

### B. Mr. Rocha's USSG Calculation.

Mr. Rocha respectfully submits that his guidelines are more appropriately calculated as follows:

*1.  Criminal History Score and Criminal History Category*

As noted above, U.S. Probation has determined that Mr. Rocha has no prior record or predicate offenses and therefore has a criminal history category history score of zero.  His criminal history of zero establishes a criminal history category of I.

*2.  Laundered Funds Attribution.*

---

[3] U.S. Probation appears to have some inconsistency in allowing the Adjustment for Acceptance of Responsibility, stating that "the defendant has not demonstrated acceptance of responsibility and therefore not being granted a reduction for the same," but later stating that "the defendant has clearly demonstrated  acceptance of responsibility for the offense and granting a 3-level reduction.  *Compare* PSR paragraph 37 and 48 & 49.

The base offense level for money laundering is 8 pursuant to USSG §2S1.1(a)(2). A 2-level increase pursuant to USSG §2S1.1(B)(2) is applicable as the defendant was convicted under 18 USC §1956.  The defendant submits that the loss amount attributable to him is at worst between $3,500,000 and less than $9,500,000, therefore there is an 18-level enhancement. USSG §2B 1.1 (B)(1)(J). Therefore, the defendant submits that the base offense level is 28.  Mr. Rocha respectfully submits that the remaining $17,000,000 found inside the apartment should not be attributed to him for purposes of the sentencing because the mere presence of other funds neither constitutes the offense of money laundering nor does it constitute relevant conduct. The defendant's base offense level should be calculated based not merely on the offense of conviction, but also on, among other things, "all acts and omissions committed, aided, embedded, counsel, commanded, induced, procured fully caused by the defendant" that were part of the same course of conduct or common scheme or plan as the offense of conviction. *U.S. v. St. Hill*, 768 F.3d 33, 36 (1st Cir. 2014). In order to determine if the allegedly relevant conduct is part of the "same course of conduct" as the offense of conviction, the Guidelines require consideration of the following factors: whether they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *St. Hill*, 768 F.3d at 36. Similarly, for a relevant conduct to be part of the same "common scheme or plan" as the offense of conviction, the Guidelines require consideration of the following factors: "whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity the offenses, the regularity (repetitions") of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. Id at 36 – 37.

Here, the government appears to say that the mere presence of other money in the apartment which was neither owned nor controlled by Mr. Rocha gives rise to relevant conduct and should be considered in the sentencing. There has been no showing that the funds inside the apartment are part of the "same course of conduct" or a "common scheme or plan" as the offense of conviction. The indictment is clear that Mr. Rocha is not the owner of the funds, he does not control the funds, he was neither the supervisor or person responsible who set up the exchange with the undercover operative, nor was he responsible for establishing the amount to be transferred.  Moreover, there is no evidence that Mr. Rocha would be transferring any of the other funds inside the apartment.  The evidence clearly sets forth that Mr. Rocha was a mule who was sent by others for the purpose of providing a sum certain of cash to the undercover operative which had previously been determined by Wanzeler and/or Casula.  There is simply no evidence to suggest that the other money inside the apartment would be provided to the operative or was otherwise intended or to be distributed by Mr. Rocha as part any alleged money laundering.

There is no evidence that Mr. Rocha had knowledge or intended to distribute the other funds or was involved in wholesale money-laundering of the other funds.  The only commonality between the offense of conviction and the other funds is that Mr. Rocha knew where the funds were located and had access to the apartment. It is respectfully submitted that where, as here, the manner in which the offense of conviction was perpetrated was planned and controlled by another, and where there is no evidence of any further delivery by Mr. Rocha, mere likeness of participants and or cash is simply insufficient to establish either a like course of conduct or common scheme or plan. Accordingly, it is respectfully submitted the remaining funds inside the apartment should not be included as relevant conduct for calculating loss amount.

3. *There is No Basis for a 2 Level Upward Adjustment For Sophisticated Laundering.*

US Probation has included a 2-level increase alleging that the offense involved sophisticated laundering; suggesting that the laundering methods in this case coincide with examples under USSG §2S 1.1 and Application Note 5(A) where the laundered funds were being moved internationally under false pretenses in a layered fashion. The defendant objects to this characterization, particularly given his very limited role in this matter. As noted above, both the Indictment and government's version of facts, make clear that it was Wanzeler and Casula who were the masterminds behind Telexfree and the money laundering – and they sent people from Brazil to the United States to move money.. It was also Wanzeler and Casula who negotiated with the cooperating witness, originally through an intermediary, and sought out the cooperating witness' assistance in getting the cash out of the United States. *See* PSR ¶¶ 16 – 17.

In addition, the government alleges that the cooperating witness was contacted by Casula and all negotiations were between Casula and Wanzeler and the cooperating witness. There is simply no evidence that Mr. Rocha participated in these negotiations, or had any knowledge of the destination of the money much less that it was being moved outside of the United States. The only information the government provided is that Casula directed Mr. Rocha to enter the United States and provide a predetermined sum in a suitcase and deliver it to an individual using the name "John" who was wearing a white hat. In addition, it was Casula who established with the cooperating witness the make and models of cars that would be involved and where the transfer would take place. See PSR at ¶¶19, 24 and 25. In fact, the government statement of facts highlights Mr. Rocha's lack of information:

"During the transfer, the CW asked Rocha the total amount and whether Rocha counted it.… The CW asked Rocha if there would be more that week; Rocha replied that he did not know, he had just been told to drop off the money and that the CW would have to talk to Casula." *See* PSR at ¶28.

Against this backdrop, there is no factual basis for a 2-level increase for sophisticated laundering against Mr. Rocha.

*4.   Minimal Role Adjustment*

Mr. Rocha respectfully submits a 4-level minimal role adjustment ought to be applied, pursuant to USSG §3B 1.2. Under §3B 1.2, a defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant" may be eligible for a downward adjustment. USSG §3B 1.2, Application Note 3. Subsection (a) authorizes a 4-level reduction in a defendant's offense level "if the defendant was a minimal participant in any criminal activity." The First Circuit has previously stated that the "average participant also includes, not only the co-participants to the actual crime, but also "the universe of persons participating in similar crimes." *United States v. Santos*, 357 F. 3d 136, 142 (1ˢᵗ Cir. 2004). However, the April 9, 2015 revision to the USSG (which took effect November 1, 2015) specifically rejects this reading of §3B1.2 and directs courts to compare the defendant with the other participants "*in the criminal activity*." USSG section 3B 1.2, Application Note 3(A) (emphasis added). Here, a review of the factors set forth in Application Note 3(C) amply demonstrate Mr. Rocha is entitled to a 4-level adjustment for his minimal role in the offense:

It is undisputed that Mr. Rocha was not involved in the Telexfree scheme and had no role in the conspiracy which was investigated by the government beginning in or about mid-2013 and continued until on or about April 14, 2014. Mr. Rocha has no involvement at all with the criminal activities of Wanzeler and/or Casula until he was sent to the United States by Casula. Even then, his role was extremely limited. The government alleges that Casula made arrangements for $1 million in cash to be delivered by someone who they allege was Rocha

to transfer cash to a cooperating witness, but that transfer in February 2016 did not occur. Importantly, the government alleges that other attempts were made to transfer the funds to the cooperating witness, but Casula canceled each time. *See* PSR ¶¶ 19 and 20.

The government alleges that in August 2016 two men would bring cash to the cooperating witness in the Boston area and Casula described the men as Brazilian students studying in the US. Again, the government alleges Casula eventually again canceled the transfer telling the cooperating witness that things were not ready. There is no active involvement against Rocha alleged by the government during that time frame.

In late December 2016, Casula contacted the cooperating witness to set up an attempt to deliver cash and he told the cooperating witness the meeting would take place at the 99 Restaurant in Hudson, Massachusetts. *See* PSR ¶ 22. Thereafter, federal agents were alerted that M. Rocha had entered the United States through JFK airport in New York. On January 3, 2017, Casula told the cooperating witness that the man who would meet him would using the name "Pete" and wear a red jacket. Casula further indicated that the cooperating witness would use the name "John" and wear a white hat and they would transfer the money at the restaurant bar. See PSR ¶¶ 23, 24. On January 4, 2017 federal agents observed Mr. Rocha enter the 99 Restaurant parking lot, and eventually transfer a medium rolling suitcase from the trunk of the red SUV to the cooperating witness' trunk. *See* PSR ¶¶ 25 through 27.

In sum, Mr. Rocha's role in the offense was limited to knowingly delivering a medium-size rolling suitcase which contained approximately $2.2 million; pursuant to Casula's instructions regarding its delivery; and giving the cooperating witness possession of the package. None of the intercepted conversations between Casula and the cooperating witness suggests that Mr. Rocha had any knowledge of the scope and structure of the organization. See Application Note 3(C) (i).

He neither planned the shipments (indeed he was simply told by Casula the location and place) nor what would be done with the packages after they were delivered. See Application Note 3(C) (ii), (iii).  Mr. Rocha had only limited minimal involvement during the shortest period of the conspiracy. See Application Note 3(C)(iv).. And Mr. Rocha received no compensation for his part or the delivery. In comparison with the millions of dollars Wanzeler and Casula earned as a result of their conduct in the Telexfree scheme and the money laundering conspiracy, Mr. Rocha's gain pales in comparison. See Application Note 3(C)(v). In sum, it is respectfully submitted that a 4-level minimal role adjustment is warranted in the circumstances.

    *5.   Summary of Mr. Rocha's Guidelines Calculation*

  Based on the foregoing, Mr. Rocha respectfully submits his offense level and resulting guidelines range should be calculated as follows:

| | |
|---|---|
| BOL – USSG  §§ 2S1.1, 2B1.1(J) | 28 |
| Minimal Role in the Offense – USSG §3B1.2(a) | -4 |
| Acceptance of Responsibility – USSG §3E1.1(b) | -3 |
| Total Offense Level | 21 |
| Criminal History Category | I |
| **Guidelines Sentencing Range** | **37-46 months** |

**2.  The Requested Sentence is Sufficient, But Not Greater Than Necessary , To Comply With the Statutory Purposes Set Forth In Under the Sentencing Reform Act.**

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *United States v. Jiminez– Beltre*, 440 F.3d 514, 518 – 19 (1st Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather it is a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough*, 552 U.S. at 101). That tenet – the

"parsimony principle" – instructs "district courts to impose a sentence sufficient but not greater the necessary" to accomplish the goals of sentencing." *Id*. (quoting 18 USC section 3553 (a)).

1. **Mr. Rocha Exhibited Extreme Contrition [and His Actions] Opened The Door To Financial Relief to Thousands of Victims of the Telexfree Scheme.**

After he was arrested on January 4, 2017 and taken into custody, Mr. Rocha demonstrated extreme contrition with regard to his involvement with Wanzeler and Casula.  Mr. Rocha reflected on his conduct, confronted himself and admitted to his role in the money laundering**.** His contrition led to the confiscation of Nineteen Million Two Hundred Thousand Dollars ($19,200,000.00) by the agents on or about January 4, 2017.  This was an unprecedented cash recovery in the district of Massachusetts and New England region.

These actions by Mr. Rocha were monumental and also potentially placed him in an extraordinary dilemma.  Instead of maintaining the secret location of the funds, securing potential wealth for himself, Mr. Rocha exhibited an extreme act of contrition.  Mr. Rocha's actions allowed the Telexfree funds to be retuned and permitted extraordinary restitution to the over one million victims of the Telexfree scheme.

According to the government, Carlos Wanzeler, Carlos Costa and James Merrill were the leaders and decision-makers of the Telexfree global pyramid scheme in which 1,887,000 people, from over 100 countries, were victimized and lost $3,045,000,000. As the government alleged in its case against the American public leader, James Merrill, " these were real dollars, lost by real people, who trusted the Telexfree system and invested, in many cases their life savings." Government Sentencing Memorandum p.1.  The government alleged that "it is not an exaggeration to say that Merrill and codefendant Carlos Wanzeler destroyed the lives of thousands of people the world over." Id.

Despite the astronomical loss figures that would have proscribed multiple life-sentences under the Sentencing Guidelines based on Merrill's loss amount alone, the government's position was that Merrill was to be sentenced to a term of Ten (10) years prison, because he "understood and helped design Telexfree's compensation system; helped explain and promote it to investors; ran the company day-to-day; controlled all of the bank accounts; and exhorted exerted more and more people to sign up. But he knew from the beginning about the risks of pyramid schemes and – more importantly – the flaws in Telexfree's compensation system. Even in the face of mounting customer concerns, lawyer's warnings, legal challenges, government investigations, Merrill continually lied, affirmatively and by omission, to the millions of investors who trusted him. Meanwhile, he paid himself over $4,500,000.00." Government Sentencing Memorandum P.1..

In April 2014, Telexfree collapsed owing approximately $6,000,000,000 to about 2,000,000 people. As the government argued, by that point Merrill had run Telexfree for two years, controlled the bank accounts, and received months of stark warnings that Telexfree was a pyramid scheme. In addition, the government alleged that in December 2013, Merrill had wired $10 million to himself and his two co-conspirators. Government Sentencing Memorandum p. 2. The government readily conceded in the Merrill prosecution that the true loss for the 1,887,000 victims of Telexfree was well over $3,000,000,000 and "[t]his is many magnitudes above $550,000,000  , the top rung in the sentencing chart for financial crimes.  See U.S.S.G. §2B1.1(b)(1)(P)…"  Government Sentencing Memorandum, p. 27.   The government also argued and recognized that Merrill was an "organizer or leader," that the conduct caused a "substantial hardship to more than 25 people," and used "sophisticated means" as the scheme operated in countries outside of the United States.

And yet despite the ongoing and complex scheme which ruined the lives of thousands of investors, the government argued for a sentence of 10 years for Merrill as appropriate.   Id. At pp. 28-29, 30-32.  The court ultimately imposed a sentence of 72 months for James Merrill. Based solely on the loss figures and the sentence imposed against Merrill, Mr. Rocha proportionally would receive a sentence of .46 months – less than one-half month!  And this gives no credit to the restitution funds made available due to the cooperation by Mr. Rocha.

2.   Sentencing Disparities.

One of the primary purposes of the Sentencing Guidelines is to promote uniformity in sentencing. See Introductory Commentary to the USSG. Indeed, one of 18 USC §3553 (a)'s factors requires "[t]he court, in determining the particular sentence to be imposed, [t]o consider... the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Although every defendant in a conspiracy or related matter who appears before this Honorable Court has a different background of life experiences, is responsible for different aspects of that conspiracy or scheme, and may have different criminal history considerations, Mr. Rocha respectfully submits any sentence on a parity with James Merrill in the related Telexfree scheme case would work a great disparity. Merrill was the public leader of Telexfree, and had routine access to all information.  Merrill publicly and actively led Telexfree through the website and personal appearances; he also controlled Telexfree's bank accounts and had access to Telexfree's bank records, staff and participants.  Government Sentencing memorandum pp. 1-13.

In addition, the loss attributable to Merrill and Telexfree was in excess of $3 billion, a sevenfold multiplier of the maximum sentencing guidelines. In addition, Merrill paid himself over $4,500,000. Government Sentencing Memorandum, pp. 9-27. In contrast, Mr. Rocha's

activities did not target innocent victims, and did not ruin the lives of others.  His conduct which involved delivering cash in a suitcase per the directions of Wanzeler and Casula, and had no other ties to the financial aspects of the Telexfree scheme. Merrill joined the Telexfree scheme as early as February 2012, whereas Mr. Rocha's involvement was limited to the post-Telexfree time period in 2016 and 2017. Merrill worked closely with Wanzeler - the architect of the Telexfree scheme in operating the scheme, whereas Mr. Rocha acted pursuant to instructions he was given on a small handful of occasions. The total loss attributed to Merrill was over $3 billion and he personally benefitted from his actions in excess of $4.5 million. *See* Government Sentencing Memorandum, pp. 1, 27-29. Whereas Mr. Rocha earned no compensation in exchange for the favor of delivering the suitcase to the undercover operative. Despite these loss figures, the government recommended that Merrill receive a 10-year sentence.  Merrill was ultimately sentenced by the Honorable Justice Timothy S. Hillman to a term of 72 months imprisonment, followed by 3 years of supervised release. In comparison to Merrill's leadership role and extensive, long-term involvement in the Telexfree scheme and "staggering victim losses", Mr. Rocha is deserving of a far, far lesser sentence.

## CONCLUSION

Based upon the foregoing, Mr. Rocha respectfully requests that this Honorable Court sentence him to a 14-month term of imprisonment, followed by voluntary deportation to Brazil. Mr. Rocha also respectfully request that if this Honorable Court exceeds this recommended sentence, the Court make the following judicial recommendations: (1.) that Mr. Rocha be housed in the Devens facility.

> Respectfully submitted,
> CLEBER RENE RIZERIO ROCHA
> By his attorneys,
>
> /s/ Raymond Sayeg
> Raymond Sayeg
> BBO No. 555437
> Krattenmaker, O'Connor & Ingber P.C.
> One McKinley Square, 5th Floor
> Boston, Massachusetts 02109
> Tel.: (617) 523-1010

Dated: December 19, 2017                    rsayeg@koilaw.com

## CERTIFICATE OF SERVICE

I certify that this document was filed through ECF and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

> /s/Raymond Sayeg
>
> Raymond Sayeg